Earl WASHINGTON, Jr., Plaintiff,

v.

Kenneth H. BURAKER, Charles Jones, Harlan Lee Hart, Gerald Yancey, Gary L. Close, Terry Schrum, Curtis Reese Wilmore, Luther Cox, Denny A. Zeets, Town of Culpeper, Virginia, Fauquier County, Virginia, Mary L Jones, Personal Representative of the Estate of C.B. Jones. Defendants.

No. CIV.A.3:02 CV 00106.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Feb. 2, 2004.

Barry A. Weinstein, Blairsville, GA, Deborah L. Cornwall, Peter J. Neufeld, Cochran Neufeld & Scheck LLP, New York City, Kelly M. Baldrate, Victor M. Glasberg, Victor M. Glasberg & Associates, Alexandria, VA, Robert T. Hall, Hall Sickels Rostant Frei & Kattenburg, PC, Reston, VA, Steven David Rosenfield, Rosenfield & Wayland, Charlottesville, VA, for Plaintiff.

Jeremy D. Capps, Richard K. Bennett, Harman Claytor Corrigan & Wellman, Brian E. Pumphrey, William G. Broaddus, McGuirewoods LLP, Richmond, VA, Brian Keith Brake, Mark D. Obenshain, Keeler Obenshain PC, Harrisonburg, VA, Patrick C. Asplin, Keeler Obenshain PC, Charlottesville, VA, Jack L. Gould, Fairfax, VA, for Defendants.

## MEMORANDUM OPINION

MOON, District Judge.

### I. INTRODUCTION

The Court has before it the following motions:

1) Defendants Terry Schrum, Denny A. Zeets and Luther Cox's Motion to Dis-

miss on the Ground of Qualified Immunity, filed September 8, 2003;[1]

2) Defendant Curtis Reese Wilmore's Motion for Summary Judgment Based on Qualified Immunity, filed November 26, 2003; and,

3) Defendant Kenneth H. Buraker, Harlan Lee Hart, Charles Jones, and the Town of Culpeper's (collectively, the "Culpeper Defendants") Motion for Summary Judgment Based on Qualified Immunity, filed October 17, 2003.

On January 20, 1984, Plaintiff Earl Washington Jr. ("Washington") was convicted and sentenced to death for the rape and murder of Rebecca Lynn Williams ("Williams") in the Town of Culpeper, Virginia. After serving 17 years in prison, however, Washington was pardoned by Virginia Governor James S. Gilmore, III. Washington was pardoned due to DNA testing which indicated that he was not the source of fluids found at the scene of the Williams murder.

Washington alleges that he was unjustly convicted and that his incarceration was "the result of a concerted effort by law enforcement officers ... to convict him for these brutal crimes despite the total absence of credible evidence against him." (Amended Complaint ¶ 2.) Based on these allegations Washington has filed claims against a number of police officers, the Town of Culpeper, and the Commonwealth Attorney for the Town of Culpeper.

Terry Schrum ("Schrum") and Denny A. Zeets ("Zeets") were officers of the Fauquier County Sheriff's Office and were involved in the initial apprehension and questioning of Washington. After questioning, Washington confessed to murdering Williams. Schrum and Zeets notified Culpeper authorities that a suspect in the Williams murder was in custody.

Curtis Reese Wilmore ("Wilmore") was a Special Agent of the Virginia State Police. Kenneth H. Buraker ("Buraker") and Harlan Lee Hart ("Hart") were police officers of the Town of Culpeper Police Department. Wilmore and Hart were involved in the investigation of the Williams murder, and took over the interrogation of Washington after his initial confession. Buraker was also involved in the investigation, but was not involved in the interrogation of Washington. Charles Jones ("Jones") was the Chief of Police of the Town of Culpeper, and supervised Buraker and Hart.

Defendants argue that they are entitled to qualified immunity, and each defendant has filed a motion for summary judgment on that basis.

## II. LEGAL STANDARDS

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether there is a genuine issue of material fact, "the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in its favor." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir.2001). A mere scintilla of proof, however, will not suffice to prevent summary judgment; the

1. Though filed as a Motion to Dismiss, this motion will be treated as a Motion for Summary Judgment, as discussed in this Court's November 6, 2003 Order. *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...").

question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party" resisting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks omitted).

The threshold question in the qualified immunity analysis is whether or not the officer violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the answer to that threshold question is yes, the officer is may still be entitled to qualified immunity if the right was not clearly established at the time of the events at issue. *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir.2002). "If the right was not 'clearly established' in the 'specific context of the case'—that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted'—then the law affords immunity from suit." *Id.* (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.) "Thus a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999).

Government officials performing discretionary functions are generally protected from civil damages liability as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Williams v. Hansen*, 326 F.3d 569, 583 (4th Cir.2003). Qualified immunity should be resolved by the trial judge at the earliest possible stage of litigation. *See* *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (noting that qualified immunity is "an immunity from suit rather than a mere defense to liability" and "such pretrial matters as discovery are to be avoided if possible.").

The discovery deadline in this action is currently set for June 30, 2004. Because discovery is not yet complete, this Court must deny Defendants' motions for summary judgment based on qualified immunity if it concludes "(1) that the plaintiff alleged a violation of a clearly established right, but (2) that there existed a material factual dispute over what actually occurred, and (3) under the defendant's version, a reasonable official could have believed that his conduct was lawful." *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir.1995) (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

### III. BACKGROUND

On June 4, 1982, Rebecca Lynn Williams ("Williams") was raped and murdered in her apartment in Culpeper, Virginia. Williams was stabbed 38 times. Before she died, Williams identified her attacker as a black male with a beard. On May 21, 1983, Plaintiff Earl Washington ("Washington") was arrested by Sheriffs in Fauquier County, Virginia for breaking into the home of Helen Weeks, a 73 year-old woman, stealing a gun and money from her, and beating her with a chair. Washington shot his brother with the gun he stole from Ms. Weeks. As a result of these events Washington was sentenced to two consecutive 15–year prison terms.

While Washington was in custody for the incident involving Helen Weeks, he was questioned about the rape and murder of Williams. Washington confessed to murdering Williams on May 21, 1983. This confession was made to Schrum and

Zeets, police officers of the Faquier County Sheriffs Office. According to Washington's Amended Complaint "[a]lthough they knew or should have known that MR. WASHINGTON had already provided false confessions to several crimes, defendants ZEETS and SCHRUM deliberately or recklessly, and coercively, asked a series of leading questions, including details of the crime, to secure his false confession to the murder of Rebecca Lynn Williams." (Amended Complaint ¶ 31.)

After obtaining this confession, Schrum and Zeets notified the Culpeper Police. On May 22, 1983, Wilmore, a special agent of the Virginia State Police, and Hart, a police officer of the Town of Culpeper Police Department, conferred with Zeets and Schrum and began questioning Washington. Washington alleges that "[b]ased on MR. WASHINGTON's statements, defendants WILMORE and HART knew or should have known that MR. WASHINGTON's 'confession' about the murder of Rebecca Lynn Williams was false." (Complaint ¶ 33.) After Wilmore and Hart talked to Washington for about an hour, they wrote out a statement in longhand, had it typed, and Washington signed this statement as his confession to the murder of Williams.

Washington's trial began on January 18, 1984, and on January 20, 1984, the jury returned a verdict of guilty, and recommended a sentence of death. After a sentencing hearing on March 20, 1984, the trial judge entered a final order imposing the death sentence, and an execution date was set for July 27, 1984. Washington subsequently filed a number of appeals and a Petition for a Writ of Habeas Corpus. All were denied.

In late September of 1993 DNA testing was performed, and on October 25, 1993, the Virginia Division of Forensic Science issued a report stating that the semen evidence recovered from the victim contained a genetic characteristic that was not shared by the victim, her husband, or Washington. Based on this evidence Governor L. Douglas Wilder commuted Washington's sentence to life in prison with the right of parole.

After further developments in DNA technology made additional testing possible, Washington successfully lobbied Governor James S. Gilmore, III to release forensic evidence for new DNA testing. Based on this testing, on September 7, 2000, Governor Gilmore issued a pardon to Washington.

## IV. DISCUSSION

### A) Count I ("Coerced False Confession")

In Count I of his Amended Complaint Washington alleges that "Defendants WILMORE, HART, ZEETS, SCHRUM knew or should have known that MR. WASHINGTON was not involved in the rape and murder of Rebecca Lynn Williams. Nonetheless these defendants used leading questions to feed MR. WASHINGTON details of the crime, relentlessly interrogated him until he finally gave them the incriminating answers they had provided him, and he 'confessed' to a crime he did not commit." (Amended Complaint ¶ 80.) According to the Amended Complaint "MR. WASHINGTON's false statements were later used against him to obtain or procure a murder and/or arrest warrant. The information was used both as an instrument charging him with murder and later as evidence at his trial, in violation of his clearly established Fifth Amendment rights." (Amended Complaint ¶ 82. ) Washington also alleges that the police campaign to compel him to confess constitutes the deliberate fabrication of evidence, which establishes a violation of

Washington's Fourteenth Amendment rights. (Amended Complaint ¶¶ 81, 83.)

■ The Court will construe the language in paragraph 80 of Washington's First Amended Complaint as an allegation that the investigators knew Washington was not involved in the rape and murder of Williams.[2] An official who fabricates evidence for use in a criminal proceeding violates the Fourteenth Amendment. *Miller v. Pate,* 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (Holding that it was a violation of the Fourteenth Amendment for a prosecutor to represent that a pair of shorts were blood-stained shorts, when the shorts were actually stained by paint.). The reasoning in *Miller v. Pate* makes it clear that police officers cannot claim that a suspect confessed to a crime if those officers know that the suspect is innocent. Accordingly, Washington has alleged a constitutional violation.

To overcome the fact that Washington's response to the questions asked by Schrum, Zeets, Hart and Wilmore was an admission of the rape and murder of Williams, Washington argues that Defendants coerced his confession. It is well established that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Unconstitutional

"coercion can be mental as well as physical, and ... the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). The relevant question is:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (citation omitted). *Culombe* makes it clear that both today and in 1983 it was unconstitutional for a police officer to coerce a suspect's confession.

If, as Washington alleges, the interrogating officers knew Washington was innocent and continued to ask him leading questions to feed him details of the Williams rape and murder until he confessed to the crime, and then used that confession against Washington to procure a murder warrant and ultimately a murder conviction, those officers have clearly violated Washington's due process rights under the constitution. Furthermore, based

---

**2.** Due process claims have historically "applied to *deliberate* decisions of government officials to deprive a person of life, liberty or property." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (emphasis in original). There can be no due process violation unless the defendant's conduct is so outrageous that it may fairly be said to shock the conscience. *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708,

140 L.Ed.2d 1043 (1998). *See also Jean v. Collins,* 221 F.3d 656, 660–61 (4th Cir.2000) (Declining to hold police officers liable under the Fourteenth Amendment for negligent or inadvertent actions.). To the extent that Washington alleges negligent or reckless action on the part of the investigating officers, his allegations do not rise to the level of a constitutional violation.

on both *Culombe* and *Miller*, such a violation was clearly established in 1983.

The Culpeper defendants argue, *inter alia*, that Washington's confession was found to be admissible during Washington's criminal trial, and thus a reasonable police officer would believe that the confession was properly obtained. This ignores Washington's allegation that the interrogating officers knew he was not involved in the rape and murder of Williams, but coerced and used his confession in spite of their knowledge that he was innocent.

Wilmore, Zeets, and Schrum attempt to introduce facts that, if believed, would demonstrate they had no knowledge of Washington's innocence, and were properly performing their duties by interrogating Washington. These facts will be considered after Washington has been given an opportunity to conduct limited discovery.

In an Order entered November 7, 2003, this Court stated that it would treat Schrum, Zeets, and Cox's Motion to Dismiss as a Motion for Summary Judgment, and allowed Plaintiff additional time to file evidence in opposition to that motion. On October 24, 2003, Plaintiff stated in his Sur–Reply Brief in Opposition to Qualified Immunity Motion that he was filing evidence, though he has not yet had the opportunity to take depositions. Plaintiff, in response to summary judgment motions made by other defendants, states that he will not argue factual matters until discovery is completed.

▆▆▆▆ This case was originally filed on September 30, 2002. The court has given Plaintiff ample time to conduct discovery in the sixteen months since this case has been filed. "When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense.

It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford–El v. Britton*, 523 U.S. 574, 597–598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In order to prevent unnecessary discovery, Plaintiff is directed to conduct discovery on the limited issue of whether officers Wilmore, Hart, Zeets and Schrum had actual knowledge of Washington's innocence at the time of Washington's interrogation. *See id.* ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.")

Washington shall have twenty-one (21) days from the date of this Order to conduct any necessary discovery on this issue. On or before March 1, 2004, Washington shall file with the Court a supplemental brief, not to exceed fifteen pages in length, and any evidence that tends to prove that the investigating officers deliberately violated his due process rights. If no such evidence is submitted, summary judgment on this cause of action shall be granted against Plaintiff and in favor of Wilmore, Hart, Zeets and Schrum. On or before March 8, 2004, Defendants may file a brief, not to exceed fifteen pages in length, in response to Washington's supplemental brief.

**B. Count II ("Unreasonable Seizure")**

In Count II of his Amended Complaint Washington alleges:

None of the fabricated and false statements or 'confessions' of MR. WASHINGTON provided probable cause to arrest him for the rape and murder of Rebecca Lynn Williams. No other evidence giving rise to probable cause existed, and in fact MR. WASHINGTON was innocent of any crime against Ms.

Williams. Defendants WILMORE, HART, ZEETS, SCHRUM knew or should have known that they lacked even arguable probable cause to arrest MR. WASHINGTON.

(Amended Complaint ¶¶ 86–87.)

 It is clearly unconstitutional for an officer to arrest a suspect without probable cause. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Probable cause exists where "the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) (quoted by *U.S. v. Martin*, 690 F.2d 416, 419 (4th Cir.1982)).

 Plaintiff, however, has also alleged the following:

On May 21, 1983, plaintiff EARL WASHINGTON was arrested on unrelated charges by Deputy Sheriffs in Fauquier County, Virginia. Fauquier County deputy Sheriff, defendant ZEETS, questioned MR. WASHINGTON about the burglary of a pistol from MR. WASHINGTON's neighbor, Mrs. Hazel Weeks, who had been assaulted earlier that day. MR. WASHINGTON confessed to these crimes and after prodding by ZEETS, also gave a vivid account of the attempted rape of Mrs. Weeks. Yet there had been no attempted rape, as Mrs. Weeks later testified at his preliminary hearing.

[First Amended Complaint ¶¶ 27–28.] There is no allegation that Washington's confession was in any way improper with regard to the burglary of Hazel Weeks. Accordingly, based on Plaintiff's allega-

tions, it appears that probable cause existed for the arrest and subsequent detention of Washington. Furthermore, the Court finds that no reasonable officer in the position of Wilmore, Hart, Zeets, or Schrum at the time of Washington's arrest and interrogation in 1983 would have believed it unconstitutional to detain Washington under the circumstances. Accordingly, Wilmore, Hart, Zeets and Schrum are entitled to qualified immunity as to Washington's second cause of action.

## C. Count III ("Failure to Disclose")

 Washington alleges in his third cause of action that Wilmore, Hart, Zeets, Schrum and Buraker failed to disclose exculpatory evidence as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963.) [First Amended Complaint ¶ 95.] To find a *Brady* violation during post-trial review of the government's actions, a court must determine: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the evidence was "material" or that prejudice resulted from its suppression. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Washington claims, among other things, that the investigating officers, in bad faith, destroyed tape recordings, reports or notes of the interrogation of Washington that would have provided evidence of their misconduct and exculpated Washington. [First Amended Complaint ¶ 94C] Washington also alleges that investigators failed to disclose to the prosecutor the identity of eyewitnesses who failed to identify Washington. [First Amended Complaint ¶ 94D.]

The Court must first determine whether under *Brady* a claim can be brought

against a police officer. The Fourth Circuit, in *Jean v. Collins*, 155 F.3d 701 (4th Cir.1998) *(en banc)* *("Jean I")*, *vacated and remanded*, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999), addressed this question and found that, as of 1982, police had no duty to provide evidence to a prosecutor. *Id.* at 709–711. Specifically, the *Jean I* court found:

> [P]olice officers in 1982 could reasonably have expected to be internally accountable to prosecutors for not turning over evidence in their possession. A failure to turn over exculpatory evidence might jeopardize a conviction under *Brady*. A failure to turn over inculpatory evidence might undermine the State's case. But the officers had no earthly idea that they would be subject to a federal cause of action for money damages when no relevant decision had held that the police's responsibility to furnish evidence to the prosecution was governed by federal constitutional law.

*Id.* at 710. The Fourth Circuit, in affirming the District Court's grant of summary judgment, went on to state in a footnote that the Fourth Circuit, since 1982, has recognized that the failure of police officers to turn over evidence to a prosecutor may violate a criminal defendant's constitutional right to receive such evidence. *Id.* at 710 n. 3.

The Fourth Circuit's decision in *Jean I* was vacated and remanded for further consideration in light of *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In *Wilson* the Supreme Court clarified the proper qualified immunity analysis, stating that a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* at 1697 (quoting *Conn v. Gabbert*, 526 U.S.

286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)).

On remand, in *Jean v. Collins*, 221 F.3d 656 (4th Cir.2000) *(Jean II)*, an equally divided *en banc* Court again affirmed the District Court's grant of summary judgment. The opinion for affirmance (designated as a concurring opinion) holds that there was no constitutional violation where a police officer, in good faith, failed to disclose exculpatory evidence. *Id.* at 663 (Wilkinson concurrence, joined by Judges Widener, Wilkins, Niemeyer, Williams, and Traxler.). The concurrence points out that the *Brady* duty is one that rests with the prosecution, declines to "impose a sweeping duty on police in the instant situation and notes the obvious drawbacks of doing so," and then goes on to note numerous difficulties that would be created if plaintiffs could raise an independent cause of action against police officers under *Brady*. *Id.* at 660–62.

The Murnaghan dissent argues that officers owe an independent duty under *Brady* to disclose exculpatory information. *Id.* at 664 (Murnaghan dissent, joined by Judges Michael, Diana Gribbon Motz, King and Hamilton.) ("The State's disclosure obligation applies to police officers as well as prosecutors."). The dissent contends that in imputing the *Brady* duty to prosecutors the concurrence ignores both Fourth Circuit and Supreme Court precedent. *Id.* at 668–671. Judge Luttig, in a lone dissent, argues that the case should be remanded to the district court to allow the plaintiff to develop the facts. *Id.* at 678–79 (Luttig dissent).

■ Plaintiff recognizes that the concurrence in *Jean II* declined to extend an independent *Brady* obligation to police officers, but argues that this finding should be disregarded as dicta because the concurrence also found that the plaintiff in *Jean II* had only alleged that the police

officers were negligent, and negligent conduct is not actionable under § 1983. *Id.* at 658, 660. (Wilkinson, C.J., concurring). This Court declines to disregard the legal findings of an *en bank* panel of Fourth Circuit judges. Based on the concurrence in *Jean II*, it appears that the Fourth Circuit does not currently recognize a cause of action under *Brady* against police officers. Accordingly, Washington has not alleged a constitutional violation in his third cause of action.

Even if this Court were to disregard *Jean II* and find that a *Brady* claim could be brought against the officers in this case, Washington cannot establish that a reasonable officer in 1983 would have known his conduct in failing to disclose exculpatory information was unlawful. Washington urges the Court to apply the standard set forth in *Barbee v. Warden, Md. Penitentiary,* 331 F.2d 842 (1964). *Barbee* is a post-*Brady* case which put police on notice that "[t]he police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure." 341 F.2d at 846.

*Barbee,* however, was addressed in *Jean I,* and the Fourth Circuit found that:

> *Barbee* did not require police, as a constitutional matter, to furnish evidence to a prosecutor. Instead, as this circuit later explained, *Barbee* held simply that the police's knowledge of such evidence would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his *Brady* duties.

*Jean I,* 155 F.3d at 710 (citations omitted). *Jean I* was later vacated and remanded, but the Supreme Court did not address the *Barbee* analysis.

Washington argues that *Jean I* created new law in 1998, and has no impact on the status of the law in 1983 when the Washington investigation was taking place.

Washington goes on to argue that *Barbee* clearly established police officer liability under *Brady,* and supports this view with caselaw in the Fifth, Sixth, Seventh, Eighth, and Ninth circuits. The Court disagrees with Plaintiff's characterization of the effect of *Jean I.* In *Jean I* the Fourth Circuit analyzes the state of Fourth Circuit law in 1982, and determines that in 1982 a reasonable officer would not be aware that he was subject to a federal cause of action for money damages. *Jean I,* 155 F.3d at 710. *Jean I* did not change the law, it demonstrated that an *en banc* panel of Fourth Circuit judges did not believe that *Barbee* clearly established police officer liability under *Brady.* This Court cannot hold to the contrary, and Washington does not argue that new law was created between 1982 and 1983 that would justify a different conclusion than that found by the Fourth Circuit in *Jean I.* Accordingly, the Court find that police officer liability in 1983 under *Brady* was not clearly established.

### D. Count IV ("Failure to Investigate")

■ Plaintiff alleges in his fourth cause of action that Wilmore, Hart, Zeets, Schrum and Buraker violated his Fourteenth Amendment due process rights by "deliberately and in bad faith [choosing] not to investigate leads that would have exonerated MR. WASHINGTON." [First Amended Complaint ¶ 99.] The Culpeper defendants argue that "this is not a basis for a § 1983 claim." [Culpeper defendants' Motion for Summary Judgment, p. 2, n. 1.] Wilmore goes even further, not only arguing that there is no such cause of action, but citing Supreme Court law for the proposition that a plaintiff cannot assert a constitutional claim "for the [police's] intentional failure to investigate and determine that the wrong man was impris-

oned." [Wilmore's Motion for Summary Judgment, p. 21 (quoting *Baker v. McCollan,* 443 U.S. 137, 143, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).] In *Baker,* in response to the plaintiff's assertion that his constitutional rights had been violated because the police intentionally failed to investigate his innocence, the Supreme Court found that "[w]hatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution." *Id.* at 144, 99 S.Ct. 2689.

Washington does not respond to Defendants' arguments, and does not cite any caselaw to establish the existence of a constitutional violation where a police officer fails to investigate some leads in a criminal case. The Court is not aware of any caselaw establishing such a constitutional violation. Accordingly, Washington has not alleged a constitutional violation in his fourth cause of action.

### E. Counts V, VI, and VII ("Conspiracy," "Supervisory Liability," and "Monell")

Washington's fifth, sixth and seventh claims are each premised on the viability of his first four causes of action. Because summary judgment is not appropriate as to Washington's coerced false confession claim, summary judgment is not proper as to Washington's fifth, sixth and seventh claims.

### V. CONCLUSION

For the reasons discussed above, summary judgment is denied with regard to Washington's first, fifth, sixth and seventh causes of action. Summary judgment is granted with regard to Washington's second, third and fourth causes of action.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.